# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs July 27, 2011

## STATE OF TENNESSEE v. OSCAR DIMERY

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 266864     Don W. Poole, Judge**

---

**No. E2010-01430-CCA-R3-CD - Filed January 20, 2012**

---

A Hamilton County jury convicted the Defendant, Oscar Dimery, of second degree murder, and the trial court sentenced him to serve twenty-three years in the Tennessee Department of Correction. On appeal, the Defendant argues that the trial court erred when it admitted the Defendant's clothing into evidence because the State failed to establish a chain of custody. The Defendant also asserts that the evidence is insufficient to support his conviction. After a thorough review of the record and the applicable law, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN and JEFFREY S. BIVINS, JJ., joined.

Daniel J. Ripper, Chattanooga, Tennessee, for the appellant, Oscar Dimery.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William H. Cox, District Attorney General; and Cameron Williams and Lance Pope, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the bludgeoning death of Jacquesta Ballew at her home on September 17, 2007. Based on this event, a Hamilton County grand jury indicted the Defendant for first degree murder.[1]

## A. Suppression Hearing

On August 31 and September 2, 2009, the trial court held a suppression hearing to address whether the State could establish a chain of custody for the Defendant's clothing, which was obtained from the Hamilton County Jail's property room.[2] The following evidence was presented at the hearing: Investigator Chad Lee Rowe, a Chattanooga Police Department officer, testified that on September 18, 2007, he was called to the crime scene unit's office to process the Defendant. His duty was to take pictures of the Defendant, take his fingerprints, collect buccal swabs, and collect his clothing. Investigator Rowe took photographs of the Defendant but did nothing else because the Defendant laid on the floor and refused to move. Investigator Rowe identified the photographs he took of the Defendant, which showed the Defendant wearing a golf shirt, jeans and gray tennis shoes.

Detective Justin Kilgore, a Chattanooga Police Department officer, testified that he was the lead investigator in this case. On September 18, 2007, he interviewed the Defendant at the service center. The Defendant was wearing street clothes, but the detective could not recall the exact nature of the Defendant's clothing. He accompanied the Defendant to the jail. At the jail, the detective signed a property inventory sheet. Detective Kilgore explained that, as the arresting officer, he was responsible for listing any items of value that an inmate has when he enters the jail, such as jewelry, wallets and shoes, but he did not list clothing because he was not responsible for taking an inmate's clothing. The Defendant's property inventory sheet, marked Exhibit 4, listed a Seiko watch, keys, earrings, and a pair of tennis shoes - described as "gray Jordans." The Defendant also signed the property inventory sheet.

Another entry on the property sheet indicated that on July 13, 2009, Detective Kilgore checked out some of the Defendant's property, specifically "tennis shoes, pants, shorts, socks, underwear, and a shirt." Detective Kilgore viewed Exhibit 2 (a photograph of the Defendant) and testified that the shirt in the photograph and the one taken from the jail were the same style of shirt, although he was unsure of the color of the shirt in the photograph; that the jeans in the photograph and the ones taken from the jail were both "very dirty;" and that

---

[1] The grand jury also indicted the Defendant for coercion of a witness, allegedly occurring on September 24, 2007. The record is silent as to the disposition of this charge.

[2] In his motion, the Defendant also asserted that the seizure of the clothing was illegal, but he did not proceed with that argument at the suppression hearing, stating that it was not a legally sound argument.

the shoes in the photograph and the ones collected at the jail were the same. He further testified that "between [the Defendant's] shirt and his pants appears to be something black," and he collected a pair of black shorts at the jail. Detective Kilgore placed the clothing into the evidence room, and the items were later taken to the Tennessee Bureau of Investigation ("TBI") for testing.

On cross-examination, Detective Kilgore testified that he was not present during the booking process when the Defendant's clothing was taken. When he retrieved the clothing, the items were in brown paper bags that were rolled down at the top.

Officer Jefferson Sanders, a Hamilton County Sheriff's Office deputy, testified that he was the property officer at the Hamilton County Jail. He testified that during the first stage of the intake process an inmate removes outer clothing and shoes. Those items are placed in a black bag and held in a side room. Besides himself, the intake officers and supply officers had access to the side room. Officer Sanders explained that "they do have the Breathalyzer and stuff in there, so they go in there and do that, but inmates are not allowed in that area." The inmate, he said, was booked into the jail and eventually taken to the supply room. In the supply room, an inmate would then remove all of his clothing and was issued a uniform. The inmate's clothing was placed in a brown paper bag. Typically, officers filled out an inventory sheet listing the descriptions of the items placed into the bag. Officer Sanders testified that there was no inventory sheet for the Defendant's items.

On cross-examination, Officer Sanders testified that he was not present when the Defendant's clothing was collected. He said that either he or one of the supply officers collect the black bags from the intake area and take them to the supply room. They combine the brown bag and black bag in a garment bag, which is hung in alphabetical order. He explained that the garment bags are hung in a caged area where only officers are allowed.

Based on this evidence, the trial court determined that the State sufficiently established the chain of custody and overruled the Defendant's motion to suppress. Specifically, the trial court ruled that the Defendant's shoes, pants, shirt and undergarment were "what the State claims them to be." The trial court further ruled that there was "a reasonable assurance that the items have not been tampered with."

## B. Trial

At the Defendant's trial, the parties presented the following evidence: Chattanooga Police Officer Frank Kerns testified that on September 17, 2007, he was dispatched to 3700 Fagan Street, Apartment C, on a property damage call. When he arrived, Frances Westfield, a resident in the building, told him that "she had heard a loud noise in the rear apartment" and

someone calling for help "just prior to [his] arrival." He went to the rear apartment and noticed that the door was open into the apartment and that the "glass was broken out of the bottom part of the door." The broken glass was on a deck that lead into the apartment, and drops of blood were on the glass and the deck. Officer Kerns entered the one-room apartment, rounded a set of shelves that divided the room, and saw the victim lying in a pool of blood. He observed that the apartment was "messed up" with "stuff laying [sic] around" as if there had been a struggle. Officer Kerns checked the victim's pulse and did not find one. He then called for an ambulance.

Frances Westfield testified that she lived in the same apartment building as the victim. She explained that there were three units in the building, and the units shared a kitchen and bathroom. Ms. Westfield said that the victim knocked on her door at 2:00 a.m. on September 17, 2007, and asked for help getting the Defendant to leave her apartment. Ms. Westfield went to the victim's apartment and asked the victim and the Defendant to "not start no [sic] stuff." They replied that they would be all right, so Ms. Westfield left. At 5:00 a.m., the victim returned to Ms. Westfield's apartment because she was still trying to get the Defendant to leave her apartment. Ms. Westfield told the Defendant that she did not "want to have to be [a] chaperone," and he left the victim's apartment. She said that, when she went to the apartment at 5:00 a.m., "some other guy was over there[,] too."

Ms. Westfield testified that she saw the victim later that evening. The victim seemed tired, so Ms. Westfield gave her a pizza. She stayed with the victim while she ate and returned to her unit. At some point later in the evening, Ms. Westfield heard the victim screaming for help and for her to call the police. Ms. Westfield attempted to open her door to the shared kitchen so she could go to the victim's apartment, but the Defendant "ran behind [her] door and wouldn't let [her] out." She recalled that he was wearing a black shirt and had long dreadlocks. She locked the kitchen door, went outside, and found a phone to call the police. She sat outside to wait for the police because she was scared to go to the victim's apartment to check on her. Ms. Westfield testified that she identified the Defendant in a photographic lineup on September 17, 2007.

On cross-examination, Ms. Westfield testified that the Defendant had frequently visited the victim for three weeks prior to her death. She said that she did not hear any other noises come from the victim's apartment that night. Ms. Westfield explained that she normally could not hear anything from the victim's apartment and opined that the victim came into the shared kitchen when she yelled for help.

Chris Gaynor, the keeper of the records at the Hamilton County 911 Center, testified that the records showed that Frances Westfield made a 911 call at 8:40 p.m. on September

17, 2007. The police were dispatched approximately one minute later and arrived at the location at 8:53 p.m.

Cynthia Kale Franklin testified that the Defendant came to her house on September 17, 2007, and asked to borrow her car to do "some running around." She said they went to Darrell Jones's house,[3] at 4004 Highland Avenue, and she, Jones, and the Defendant drank beer "off and on all day." She said that the Defendant left several times with her car and returned each time. Ms. Franklin recalled that the Defendant was wearing a black t-shirt over a gray t-shirt, and at some point during the day, he removed the black t-shirt. Between 6:00 and 6:30 p.m., Ms. Franklin saw the Defendant at the corner of 38th Street and Highland Avenue. He flagged her down, but she did not stop. She said that the Defendant and his brother came over to Jones's house again at midnight. Ms. Franklin testified that she knew the victim and had visited her apartment before. According to Ms. Franklin, the victim made a living by "exchang[ing] sex for money." Ms. Franklin said that she had seen the victim and the Defendant together on "[n]umerous occasions." She observed that the victim acted differently around the Defendant: she was "happy-go-lucky" when she was not with him but "scared" when she was with him.

On cross-examination, Ms. Franklin agreed that she used crack cocaine in addition to drinking beer at Jones's house on September 17. She was present when the Defendant was told that the victim had been killed. She said that he was very upset and ran out of the house. Ms. Franklin testified that, early in the afternoon on September 17, the Defendant removed the black t-shirt he was wearing. When he came over to Jones's house at midnight, he was wearing a white t-shirt.

Investigator Chad Lee Rowe testified that in September 2007, he worked with the crime scene unit of the Chattanooga Police Department. On September 18, 2007, his sergeant called him to come to the Police Service Center to process the Defendant. He explained that processing included photographing the person, taking buccal swabs, and taking fingerprints. He took full body photographs of the Defendant, but when he tried to take pictures of the cuts on the Defendant's hands, the Defendant tucked his hands under his arms. The Defendant also laid down on the floor. Investigator Rowe tried to fingerprint the Defendant, but the Defendant laid on the floor again. Investigator Rowe testified that he normally would collect a homicide suspect's clothing, but, because the Defendant was agitated, he chose not to collect the Defendant's clothing at that time.

---

[3] Ms. Franklin referred to Darrell Jones as D.C. throughout her direct examination, but on cross-examination, she identified D.C. as Darrell Jones.

Officer Jefferson A. Sanders, of the Hamilton County Sheriff's Office, testified that he worked in the property room at the county jail. He explained the procedure for how inmates' property was taken and maintained: An arresting officer would bring an inmate to the intake area. In the intake area, the arresting officer would list all of the inmate's property on an inventory form, and an intake officer would take the list and the property, except for the inmate's clothing. The intake officer would store the property temporarily in a small room in the intake area, to which only officers had access. The arresting officer, the intake officer, and the inmate would all sign the inventory list. The inmate would proceed to the booking area, where officers would enter his information into a computer, take his picture, and fingerprint him. The officers would then place the inmate into a holding cell. If the inmate is not released on bond, the officers would take the inmate to the supply room where he would remove his clothing and put on a jumpsuit. The officers then collect the clothing in a brown paper bag. The contents of the paper bag and the property taken during the intake process are combined into a garment bag. Each item's description is recorded on an inventory sheet. The garment bag is stored in a caged and locked area within the supply room. Only supply officers have access to the supply room. If anyone removes property, it has to be documented on a log sheet.

On cross-examination, Officer Sanders testified that there was no inventory sheet for the Defendant's clothing.

Officer Brian Lockhart testified that he was employed with the Chattanooga Police Department from December 2000 until July 2008, and he processed the crime scene at 3700 Fagan Street, Apartment C, on September 17, 2007. Officer Lockhart found blood stains on: a chair outside of Apartment C, glass that had been broken out of Apartment C's security door, a sheet inside the residence, a counter top in Apartment C, the wall near where the victim was found, the kitchen floor, and a chair in the kitchen. He collected swabs from the blood stains and from blood found on the victim's back. He also collected a sheet with blood on it, two pillow shams, glass, an iron, a crackpipe found in the victim's purse, a broken ceiling tile, a kitchen knife, a pocket knife, an ashtray, toilet paper, a bandana, and a ring. Officer Lockhart swabbed the apartment's security door for DNA. He also processed a van connected with this case. Inside the van, he located and collected a bloodstained towel and swabbed a bloodstain on the armrest. Officer Lockhart also collected a crackpipe from the van. Officer Lockhart was present when another crime scene officer, Investigator Tray McGhee, photographed the Defendant on September 19, 2007, at the jail. He observed several cuts and abrasions on the Defendant's hands, arms, shoulder, and side.

On cross-examination, Officer Lockhart testified that he collected a beer bottle and a plastic cup from Apartment C. He also bagged the victim's hands before she was taken to

the medical examiner's office, and he collected the victim's fingernail clippings from the medical examiner after the autopsy.

Chattanooga Police Sergeant Darrell Lee Whitfield testified that on September 17, 2007, he was the sergeant over the crime scene unit and was called to photograph a van connected to this case. The van was located on East 36th Street in Chattanooga. He photographed a green minivan and a tissue with a red stain found on the asphalt near the van. Sergeant Whitfield was responsible for taking the physical evidence collected in this case to the TBI crime laboratory in Nashville.

Chattanooga Police Investigator Brian Russell, of the crime scene unit, testified that he photographed the victim at the medical examiner's office and collected the victim's personal belongings and clothes. He also collected a DNA sample from the Defendant. Investigator Russell transported the Defendant's clothing to the TBI laboratory for testing in July 2009.

TBI Special Agent Lauralee Staples testified that she worked in the serology and DNA unit at the Nashville Crime Laboratory. Agent Staples examined a sexual assault kit that included a sample of the victim's blood, vaginal swabs, and anal swabs. She located semen on the vaginal and anal swabs. The DNA on the vaginal swabs was a mixture of DNA from three people: the victim, an unknown male, and an unknown individual of indeterminate gender. The DNA from the anal swabs was from an unknown male. Agent Staples compared the DNA from both the anal and vaginal swabs to the Defendant's and excluded him as a contributor. Agent Staples testified that the unknown male DNA from the vaginal swabs and the unknown male DNA from the anal swabs could have come from the same person but there was insufficient material to meet threshold standards for making a comparison.

Out of the presence of the jury, the parties and the trial court discussed the chain of custody issue presented at the pretrial suppression hearing, and Detective Kilgore was called to the stand to identify which of the Defendant's garments he had seen. He viewed the photographs of the Defendant taken by Investigator Rowe and testified that the Defendant was wearing the same clothes at the jail on September 18, 2007, as he was in the photographs. He further testified that the clothing he retrieved from the jail in July 2009 was the same clothing that the Defendant was wearing on September 18, 2007. He did not see the shorts, boxer shorts, or socks that the Defendant was wearing on September 18. As a result of Detective Kilgore's testimony, the trial court ruled that only the Defendant's shirt, jeans, and shoes were admissible.

The jury returned and Special Agent Bradley Everett, of the TBI's serology and DNA unit, testified that he examined evidence collected at the crime scene from the minivan and from the medical examiner's office for the presence of blood and/or DNA. If blood was present, he compared the DNA to the Defendant's and victim's DNA. Agent Everett testified that the swab from a plastic chair tested positive for blood, but he was unable to obtain a DNA profile. He determined that the victim's blood was on the broken glass, ceiling tile, iron, ashtray, bandana, and swabs from the kitchen floor, and the victim's back. The Defendant's blood was on the swabs collected from the sheet, the countertop, the kitchen chair, and the minivan's armrest, as well as the towel and tissue paper collected from the minivan. Both the victim's and the Defendant's blood was on the sheet from the victim's apartment. Agent Everett tested the fingernail clippings from the victim for DNA and found only the victim's DNA. Agent Everett also tested the Defendant's clothing collected from the jail. The Defendant's blood was on his shirt and jeans. The victim's blood was on both of the Defendant's shoes.

Detective Kilgore testified that he was the lead investigator in this case. He interviewed Frances Westfield at the scene, and he interviewed Johnny Dimery, the Defendant's brother, and the Defendant at the police services center. The Defendant signed a rights waiver form on September 18, 2007, at 3:17 a.m. In the interview with the Defendant, Detective Kilgore inquired as to the Defendant's whereabouts on September 15, 2007, two days before the victim's death. The Defendant said that he and the victim had planned to go to her sister's wedding, but they could not go to the wedding because the Defendant's car was missing. Instead, he and the victim "got high, watched porn, and had sex all day." The Defendant said that on September 16 he went to work. The Defendant told Detective Kilgore that in the early morning hours of September 17 he was at the victim's apartment. He said that he left sometime between 2:00 a.m. and 5:00 a.m., and he gave three different reasons for leaving. First, he said that he and the victim argued, and she made him leave. Then, he said that he left because Ms. Westfield and another male were at the victim's apartment. Finally, he said that he left because the victim's landlord came by early in the morning. The Defendant stated that after he left the victim's apartment he met his brother, Johnny Dimery, and they went to Sam Jones' house at 4004 Highland Avenue. At some point during the day, the Defendant left 4004 Highland Avenue, "went and got a blunt and got high." The Defendant said that he saw Darrell Jones, Sam Jones' son, on the street. The Defendant told Darrell Jones that he would come by later to cut his hair, "but he never ended up going back." The Defendant said that he met up with his brother again, and they went to Sam Jones' house, which was when he learned of the victim's death. The Defendant said that "he took off running," and his brother "picked him up in a van down the street." The Defendant told his brother that "he wanted to go to the crime scene, but Johnny wouldn't let him, so Johnny continued to drive."

Detective Kilgore testified that the Defendant was wearing a purple polo shirt, jeans, and gray tennis shoes during the interview. He identified Exhibit 124 - Logo brand blue jeans, Exhibit 125 - size ten and a half Nike Air Jordans, and Exhibit 130 - a purple Logo brand pullover, as items that he collected from the jail, and he testified that those items appeared to be the same clothing that the Defendant was wearing during his interview. Detective Kilgore asked the Defendant about his clothing. The Defendant said that they were "booster clothes," and explained that boosting was stealing. At first, the Defendant said that he had worn the clothes all day but later said that he had gotten the clothes from a friend. Detective Kilgore noticed cuts on the Defendant's hands, and the Defendant told him that "he gets cuts all the time," "[t]hat he had jumped a fence," and that "they were old wounds." The detective observed that cuts on the Defendant's left arm "were still bleeding[;] they were fresh wounds."

Detective Kilgore testified that he arrested the Defendant for first degree murder, and another officer transported the Defendant to the jail. The detective met the Defendant in the intake area. In the intake area, the Defendant removed his shoes, which were placed into a bag, and also turned in his watch, keys, and earrings. Each item was noted on a property receipt, which the detective and the Defendant signed. The property receipt also had a notation that the Chattanooga Police Department took the Defendant's shoes, pants, shorts, socks, underwear, and shirt on July 13, 2009. Detective Kilgore's signature and badge number was underneath the notation, and the sergeant from the Hamilton County Sheriff's Office who released the items to the detective also signed the form. Detective Kilgore testified that he collected the clothing on July 13, 2009, after realizing during trial preparations that the TBI had not tested the Defendant's clothes. Detective Kilgore testified that between September 18, 2007, and July 13, 2009, he never saw the Defendant's clothing or shoes and that he did not tamper with any of the items.

Frank Knox King, M.D., the Hamilton County Medical Examiner, testified that the victim's death was a homicide, and she died from blunt force trauma to the head. He opined that the victim received "multiple blows to the head with a blunt object." Dr. King noted that there were two patterns made by whatever instrument or instruments hit the victim: one made by an "elongated, rounded object" and the other a "two-prong impact." His opinion was that if one instrument was used, "it would be something sort of long and rounded with a pronged end on it." He testified that the victim had extensive skull fractures that required a substantial amount of force to create. Dr. King estimated that the victim received five to eight separate impacts to her head. The victim also had two sharp force injuries on her back. Dr. King classified one of the sharp force injuries as an incisional wound that could have been caused by broken glass. He classified the second sharp force injury as a superficial cut. Dr. King testified that there was no evidence of defensive wounds, suggesting that the victim did not defend herself against attack. He opined that one explanation for why she would not

have defended herself was if the first blow to her head rendered her unconscious. Dr. King testified that the victim had a "relatively low amount of cocaine" in her bloodstream and her blood alcohol content was 0.10. Dr. King's staff collected a sexual activity kit, which was sent to the TBI.

Johnny Ray Dimery, the Defendant's brother, testified on his behalf. He said that he spent all of September 17, 2007, with his brother "drinking [and] getting high." Mr. Dimery testified that the Defendant borrowed a car from a friend and drove behind him to their friend Vincent's[4] house. The Defendant did not go anywhere in the car until he returned it later in the day. After he returned the car, the Defendant walked back to Vincent's house. They watched part of a football game but decided to "go and try to get a little more money or something, you know, get something else to get out with." Vincent gave the Defendant a pair of jeans to wear before they went to Walmart in Tiftonia. They did not steal anything at Walmart, so they returned to Vincent's house to finish watching the football game.

Later, when Mr. Dimery announced that he wanted to go home and invited the Defendant to stay with him that night, the Defendant said that he wanted to go to D.C.'s[5] house. Mr. Dimery went with the Defendant to D.C.'s house, and D.C. met them at the door. D.C. told them that the victim was dead and that the Defendant was a suspect. The Defendant "took off [and] hopped the fence." Mr. Dimery testified that the Defendant cut his hand when he jumped over the fence. Mr. Dimery drove after the Defendant and found him close to the street where the victim had lived. The Defendant got into Mr. Dimery's van, and Mr. Dimery told him that he would "go down there with [him]." However, a police officer stopped them before they could get there. Mr. Dimery testified that a police car drove up behind him and turned on its lights. The police officer asked them to get out of the van. They complied and were handcuffed. The police interviewed Mr. Dimery, but he did not tell them that he had spent all day with the Defendant. He explained that he did not want to tell the police that he had been getting high and trying to steal things so he could buy more drugs.

On cross-examination, Mr. Dimery testified that he did not recall telling the police that the Defendant was gone from 3:00 to 9:30, but after viewing his statement to police, dated September 18, 2007, he agreed that he told the police that he did not see the Defendant from 3:00 to 9:30. He also agreed that he told the police that, when the Defendant returned, he was not wearing a shirt.

---

[4] The witness did not provide a last name for Vincent.

[5] The witness did not know D.C.'s real name, but Ms. Franklin identified D.C. as Darrell Jones.

Based upon this evidence, the jury convicted the Defendant of second degree murder. The trial court sentenced him to twenty-three years in the Tennessee Department of Correction. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court erred when it allowed the Defendant's clothing into evidence after the State failed to establish a proper chain of custody; and (2) the evidence was insufficient to support his conviction.

### A. Chain of Custody

The Defendant contends that the trial court improperly allowed the Defendant's clothing into evidence because the State established an insufficient chain of custody. He asserts that because no witness could testify that the clothing was taken from the Defendant and because there was no inventory sheet associated with the Defendant's clothing, that the State did not sufficiently prove the identity of the clothing. Furthermore, he argues that the State did not prove the integrity of the evidence because evidentiary procedures were not followed.

Tennessee Rule of Evidence 901(a) provides: "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." In order to admit physical evidence, the party offering the evidence must either introduce a witness who is able to identify the evidence or must establish an unbroken chain of custody. *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000); *State v. Holbrooks*, 983 S.W.2d 697, 700 (Tenn. Crim. App. 1998). The identity of tangible evidence need not be proven beyond all possibility of doubt, and all possibility of tampering need not be excluded. *Scott*, 33 S.W.3d at 760. The requirement that a party establish a chain of custody before introducing such evidence is "'to demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" *Id.* (quoting *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)). The circumstances must establish a reasonable assurance of the identity of the evidence. *State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008); *State v. Kilburn*, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989). The failure to call all of the witnesses who handled the evidence does not necessarily preclude its admission into evidence. *See State v. Johnson*, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984). Absolute certainty of identification is not required. *State v. Kilpatrick*, 52 S.W.3d 81, 87 (Tenn. Crim. App. 2000). "Reasonable assurance, rather than absolute assurance, is the prerequisite for admission." *Id.* Whether the required chain of custody has been sufficiently established to justify the admission of evidence is a matter committed to the sound discretion

of the trial court, and the court's determination will not be overturned in the absence of a clearly mistaken exercise of that discretion. *State v. Holloman*, 835 S.W.2d 42, 46 (Tenn. Crim. App. 1992).

The trial court did not abuse its discretion by allowing the Defendant's clothing to be introduced into evidence. Detective Kilgore identified the clothing as the clothing the Defendant wore when he entered the jail. The trial court excluded the items of clothing that Detective Kilgore could not identify. Evidence at the suppression hearing and during the trial revealed that the clothing was kept in a locked cage in the jail's supply room, which could be accessed only by the property and supply officers. Although there was not an inventory sheet accompanying the clothing, when Detective Kilgore checked the property out, the sergeant on duty noted which items were taken on the property form associated with the intake procedure. Based upon the proof presented, we conclude that the "circumstances surrounding the evidence reasonably establish the identity of the evidence and its integrity." *Scott*, 33 S.W.3d at 760. The Defendant is not entitled to relief.

### B. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to sustain his conviction. Specifically, he argues that the evidence against him is circumstantial and "does not rule out every other hypothesis to the contrary." The State responds that the evidence is more than sufficient to sustain the Defendant's conviction for second degree murder.

It is well-established that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this Court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557–58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see also* Tenn. R. App. P. 13(e). The jury's verdict of guilt, approved by the trial judge, accredits the State's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the

jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

The guilt of a defendant, as well as any fact required to be proved, may be established by direct evidence, by circumstantial evidence, or by a combination of both. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Recently, in *State v. Sisk*, our Supreme Court clarified the use of circumstantial evidence as a basis for a conviction. 343 S.W.3d 60, 65 (Tenn. 2011). In *Sisk*, the defendant was convicted of aggravated burglary and theft at trial, primarily on the basis of circumstantial evidence. *Id.* at 63–64. The circumstantial evidence involved a cigarette butt found at the crime scene which contained a match to the defendant's DNA. *Id.* On appeal, this Court reversed, holding that the evidence was insufficient to support the convictions. *Id.* at \*60. The State appealed, arguing that the convictions should be reinstated. *Id.* On appeal our Supreme Court chronicled the history of the use of convictions based on circumstantial evidence stating:

> A criminal offense may, of course, be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973); *Marable v. State*, 203 Tenn. 440, 313 S.W.2d 451, 456–58, 461 (1958). Ultimately, however, the jury must decide the significance of the circumstantial evidence, as well as " '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable*, 313 S.W.2d at 457). Appellate courts may not substitute their own inferences for those drawn by factfinders in circumstantial evidence cases. *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010).

> Years ago, in *State v. Crawford*, 225 Tenn. 478, 470 S.W.2d 610 (1971), this Court adopted a standard of proof in criminal prosecutions based exclusively upon circumstantial evidence that purportedly required the State to prove facts and circumstances "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *Id.* at 612. This Court also stated in Crawford that in such cases, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Id.* at 613. This language was recited for years by Tennessee courts as controlling in those cases in which the sufficiency of exclusively circumstantial evidence was at issue; indeed, it was used by both the Court of Criminal Appeals and the trial court in this case. *See Sisk*, 2010 WL 3502512, at \*2. In *State v. James*, 315 S.W.3d 440, 455 n. 14 (Tenn. 2010), however,

we pointed out the inconsistency between the terminology employed in *Crawford* and its progeny and the standard of proof applied by the United States Supreme Court in those cases in which the evidence is solely circumstantial. *See Jackson*, 443 U.S. at 326, 99 S.Ct. 2781 (rejecting the notion "that the prosecution [i]s under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt"). Finally, in *State v. Dorantes,* 331 S.W.3d 370, 381 (Tenn. 2011), we adopted the federal standard in Tennessee and eschewed any distinction between the standard of proof required in cases based solely upon circumstantial evidence and that in cases where direct evidence of guilt is presented by the State. Although we observed in *Dorantes* that, as a practical matter, there was little difference between the federal standard and the "reasonable hypothesis" language used in *Crawford*, we also noted that, depending on the nature of the circumstantial evidence presented at trial, the adoption of the federal standard of proof could result in a different outcome in some cases. Id.

*Id.* at 65 (footnotes omitted). Based on that reasoning, our Supreme Court reinstated the defendant's convictions, finding:

The undamaged condition of the cigarette butt, Detective Grooms' testimony that it was unlikely the cigarette had been tracked into the house and that the victims themselves were not smokers, the proximity of the Defendant's residence to the burglarized house, the fact that the Defendant often was seen smoking outside and had never been invited into the victims' residence, and the Defendant's flight from police on January 3, 2007, all corroborate the DNA evidence. While the intermediate appellate court posited that "[s]everal plausible explanations for the presence of the defendant's cigarette inside the victims' residence come to mind, including that the cigarette butt was 'tracked' into the residence," *Sisk*, 2010 WL 3502512, at *3, our duty on appeal of a conviction is not to contemplate all plausible inferences in the Defendant's favor, but to draw all reasonable inferences from the evidence in favor of the State. Given Detective Grooms' description of the cigarette butt and its location [on the bottom of his shoe], it was perfectly reasonable for the jury to believe the State's theory that the Defendant had entered the victims' residence during the burglary and left the cigarette butt there. The evidence is sufficient to support the jury's verdict.

*Id.* at 67-68 (footnote omitted). By reinstating the convictions in *Sisk*, our Supreme Court made clear that "[t]he standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *See State v.*

*Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Applying the analysis utilized in *Sisk* and *Dorantes* to the case herein, we review the evidence at trial in a light most favorable to the State. A conviction for second degree murder requires proof beyond a reasonable doubt that the defendant unlawfully and knowingly killed the victim. *See* T.C.A. §§ 39-13-201, -210(a)(1) (2010). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. T.C.A. § 39-11-302(b) (2010).

Viewed in the light most favorable to the State, the evidence proves that the Defendant was in the victim's apartment between the hours of 2:00 a.m. and 5:00 a.m. on September 17, 2007, and the victim enlisted the assistance of another tenant, Ms. Westfield of the apartment building to get the Defendant to leave. Sometime during the evening of that day, Ms. Westfield heard the victim calling for help. When she tried to leave her apartment to go to the victim, she saw the Defendant rush past her door and close it, not allowing her to leave. When the police arrived, they found the victim lying in a pool of blood in her apartment. Dr. King testified that she died of blunt force trauma to her head. The Defendant's blood was found in her apartment, and he had at least one bleeding wound when the police interviewed him. The victim's blood was found on the Defendant's shoes. Although there was evidence that the Defendant was with his brother all day, the jury rejected this theory, which is within its province. The Defendant argues that the evidence "does not rule out every other hypothesis to the contrary;" however, under *Sisk* and *Dorantes*, that is no longer the standard. Thus, the evidence is sufficient to sustain the Defendant's conviction of second degree murder. The Defendant is not entitled to relief as to this issue.

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude that the trial court was within its discretion when it allowed the State to introduce the Defendant's clothing into evidence. Furthermore, we conclude that the record contains sufficient evidence to support the Defendant's conviction for second degree murder. As such, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE